**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
Frank R. Schirripa, Esq., (FS 1960)
Gregory Mark Nespole, Esq., (GN 6820)
112 Madison Ave, 10th Floor
New York, NY 10016
Telephone: (212) 213-8311
Facsimile: (212) 779-0028
fschirripa@hrsclaw.com
gnespole@hrsclaw.com

*Counsel for Plaintiff and Proposed Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD EPSTEIN, Individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>         v.<br><br>VALE S.A., FABIO SCHVARTSMAN and LUCIANO SIANI PIRES,<br><br>                    Defendants. | Case No:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Richard Epstein ("Plaintiff"), by his attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Vale S.A ("Vale" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons who purchased Vale common stock between April 13, 2018 and January 28, 2019, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are asserted against certain of Vale's executive officers and directors.

## JURISDICTION AND VENUE

2. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa. Further, this Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District.

## PARTIES

5. Plaintiff, as set forth in the accompanying certification, attached hereto as **Exhibit A** and incorporated by reference herein, purchased Vale common stock during the Class Period and was economically damaged thereby.

6. Defendant Vale together with its subsidiaries, produces and sells iron ore and iron ore pellets for use as raw materials in steelmaking in Brazil and internationally. It operates

through Ferrous Minerals, Coal, and Base Metals segments. The Ferrous Minerals segment produces and extracts iron ore and pellets, manganese, ferroalloys, and others ferrous products and services, as well as engages in the provision of related railroad, port, and terminal logistics services. The Coal segment is involved in the extraction of metallurgical and thermal coal; and provision of related logistic services. The Base Metals segment produces and extracts non-ferrous minerals, including nickel; and its by-products, such as ferro-nickel, cobalt, gold, silver, copper, precious metals, and others. The company was formerly known as Companhia Vale do Rio Doce and changed its name to Vale S.A. in May 2009. Vale S.A. was founded in 1942 and is headquartered in Rio de Janeiro, Brazil.

7. Defendant Fabio Schvartsman ("Schvartsman") has served as the Company's Chief Executive Officer ("CEO") since May 2017.

8. Defendant Luciano Siani Pires ("Pires") has served as the Company's Chief Financial Officer ("CFO") since August 1, 2012.

9. Defendants Schvartsman and Pires are collectively referred to herein as the "Individual Defendants" where appropriate. By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of Vale's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

3

## SUBSTANTIVE ALLEGATIONS

### Background

10.　Vale is no stranger to tragedy, wreaking havoc on the innocent, and failing to comply with industry rules and regulations.

11.　On November 5, 2015, Brazilian authorities reported that iron-ore mine operated by Samarco Mineração SA (jointly owned by Vale and another mining entity) burst, killing dozens of people and devastating the local community. The structure that failed is what is known as a tailings dam, used to hold water and discarded minerals from the nearby iron-ore mine.

12.　The tragedy resulted in Vale and co-owner BHP of Samarco, settling a civil suit with Brazilian public authorities for 20 billion real (US$5.3 billion) and additional fines to be levied in the future. Vale also agreed to community participation in decisions related to remediation and compensation programs and greater corporate compliance.

13.　Sadly, on January 25, 2019, Vale was at the center of new tragedy. On that day, a 28-story high dam at a mine meant to store chemical-laden waste, called tailings, collapsed again unleashing a river of mud that destroyed Vale facilities and flowed into parts of the town of Brumadinho in southeastern Brazil. According to authorities, within hours the death toll from the accident rose to nearly one hundred, with many still missing and feared dead.

14.　The tragedy immediately triggered a criminal probe and Vale said it would dismantle 10 other similar dams. Brazilian authorities have made several arrests, including two contractors who worked for a company that inspected the dam late last year.

15.　It was further reported that the company that certified the safety of the waste dam that collapsed worked as both a consultant and an independent safety evaluator for the dam's owner, raising questions among regulators and mining expert over potential conflicts of interest.

16. Reportedly, employees of Germany's TÜV SÜD, the company that Vale retained to certify the safety of the Company's failed dam, also acted as consultants on Vale mine closures in Brazil. The conflicted relationship is further evidenced by the fact that TÜV SÜD employees co-authored research reports with Vale and spoke at conferences alongside Vale employees.

17. International industry guidelines on the management and safety of tailings dams, like the one that collapsed here, emphasize that a safety inspector (also known in the industry and auditor) be able to demonstrate independence from their client. Commenting on the tragedy and the conflict that may have made it more likely, Eduardo Marques, a geology and engineering professor at the Federal University of Viçosa in Brazil said "in principle, this is a conflict of interest," referring in general to such dual roles.

### Materially False and Misleading
### Statements Issued During the Class Period

18. On April 13, 2018, Vale filed a Form 20-F with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2017 (the "2017 20-F"). The 2017 20-F was signed by Defendants Schvartsman and Pires. The 2017 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Schvartsman and Pires attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

19. The 2017 20-F stated the Company was committed to keeping its workplace safe and minimizing environmental damage especially in light of the disaster after the Fundão tailings dam in 2015. The 20-F stated, in relevant part:

*Commitment to sustainability*

We are committed to becoming a sustainability benchmark through a

comprehensive approach based on systematic planning and execution, prioritizing risk and impact management (seeking to achieve zero harm to our employees and surrounding communities) and establishing a positive social, economic and environmental legacy in the places where we operate. Below is a list of measures illustrating our commitment to sustainability:

- Since 2013, environmental and social actions are directly incorporated into our strategic planning. In 2017, we joined the International Council on Mining and Metals (ICMM), the most important association in the mining industry, reaffirming our commitment to sustainable development. Also in 2017, we joined the Task Force on Climate-related Financial Disclosures (TCFD). The purpose of the TCFD is to create a set of recommendations to improve the quality of voluntary disclosure of climate-related information.

- We are committed to reducing water use in our activities by investing in technologies and initiatives to control total water withdrawal, especially by promoting water reuse. In 2017, we withdrew a total of 276.3 billion liters of water, and used 179.5 billion liters in our operations (including discontinued operations), with the balance being allocated to third parties. From the total volume of water used in 2017, 83% or 148.9 billion liters was reused.

- We are committed to improving the health and safety of our workers. Our total recordable injury frequency performance in 2017 was 2.0 per million hours worked, slightly higher than the frequency of 1.89 per million hours worked recorded in the previous year, although demonstrating a 24% improvement over the last five years.

- We follow standards for social action in accordance with international guidelines, including principles on business and human rights, which are based on the Guiding Principles on Business and Human Rights of the United Nations Human Rights Council.

- In July 2016, we, together with Samarco and BHPB, established the Fundação Renova to develop and implement remediation and compensation programs over many years, in order to support the recovery of the areas and communities affected by the failure of Samarco's dam.

20. The 2017 20-F touted the methods employed by the Company to monitor and inspect pursuant to Brazilian mining and environmental regulations, stating in relevant part:

***Brazilian regulation of mining dams.***  In May 2017, the DNPM (predecessor to the ANM) created new obligations for companies operating mining

6

dams in Brazil, primarily:

- *Audit*: Companies operating mining dams must conduct two annual stability audits for each dam and prepare a stability condition report. Specifically in the State of Minas Gerais, these audits and reports must be prepared by external auditors.

- *Periodic Safety Reviews*: The stability condition report must include detailed analysis of all dam's documentation impacts on surrounding communities, including hazards and failure impact studies. Companies operating mining dams classified as high associated potential damage (DPA) must complete these studies by June 2018, while those for medium-DPA mining dams must be completed by December 2018 and those for low-DPA mining dams must be completed by June 2019.

- *Emergency Action Plan Training*: Companies operating high-DPA mining dams must conduct two annual emergency action plan training sessions for their employees.

- *Monitoring*: Video monitor must be implemented for all high-DPA mining dams by June 2019.

21.     On May 30, 2018, the Company filed a Form 6-K with the SEC, detailing the methods employed to monitor and inspect its dams under Brazilian mining and environmental regulations, stating in relevant part:

- <u>Brazilian regulation of mining dams.</u>  In May 2017, DNPM (predecessor of ANM) created new obligations (Ministerial Order DNPM n[degree] 70.389/2017) for companies that operate mining dames in Brazil, mainly:

    o *Audit:* Companies that operate mining dams must conduct two annual audits (March and September) for each dam that falls within the National Dams Security Policy (PNSB), with the issuance of the respective Stability Condition Statement (DCE), and the September audit must be carried out by an external consultant. . . .

    o *Periodic Dam Safety Review (RPSB)*: The RPBS shall submit a report containing the detailed and adequate inspection of the dam, the reassessment of existing projects, the performance of new stability analyzes as well as their category of risk and damage potential, associated with the updating of hydrological studies, reassessment of operating procedures, maintenance, instrumentation and monitoring tests, reassessment of operating procedures, maintenance, instrumentation and monitoring tests, reassessment of

7

    PAEBM (when applicable), and issuance of a Stability Condition Statement (DCE). Companies operating mining dams classified as Associated Potential Damage (DPA) should complete these studies by June 2018, while studies of average DPA mining dams should be completed by December 2018 and those of mining dams Low DPA should be completed by June 2019.

  o *Emergency Action Plan Training*: Companies operating high DPA mining dams should conduct internal training at most every six months and maintain records of activities.

22. Defendants made false and/or misleading statements and/or failed to disclose that: (1) Vale had failed to adequately assess the risk and damage potential of a dam breach at its Feijão iron ore mine especially in light of its experience in 2015; (2) Vale's programs to mitigate health and safety incidents were inadequate; (3) Defendants filed to disclose that its auditor, as required under Brazilian mining law, was not independent; (4) Defendants failed to disclose that an internal report commissioned by Vale last year to look into the stability of the tailings dam raised concerns over its drainage and monitoring systems; and (5) Defendants failed to disclose the existence of information that the dam was at risk of "liquefaction," the same issue that led to the 2015 collapse of the Samarco dam.

## THE TRUTH BEGINS TO EMERGE

23. On January 25, 2019, *Reuters* reported that Vale's tailings dam had burst at its Feijão iron ore mine. A "torrent of sludge tore through the mine's offices, including a cafeteria during lunchtime." On this news, shares of Vale fell $1.20 per share or over 8% to close at $13.66 per share on January 25, 2019.

24. Then, on January 26, 2019, *BBC News* reported that hundreds of people affected by the dam's breach remained missing, in part because the dam's alarm system failed at the time of the accident. A report by a Folha de S. Paulo newspaper stated "the risk of collapse of the dam

8

had been mentioned in a 'tense meeting' that approved its license last month[.]"

25. That same day, *Reuters* reported that Brazil's National Mining Agency ordered Vale to suspend operations at its Corrego de Feijão iron ore mining facility as a result of the dam burst. The article also stated that "State prosecutors . . . [seek] $1.3 billion [] in Vale's accounts for handling damages . . . adding that [prosecutors] expect[] more funds to be frozen in the future."

26. On January 28, 2019, *Reuters* reported "Brazil's top prosecutor said on Monday she will pursue criminal prosecutions after the collapse of a tailings dam operated by mining giant Vale SA killed at least 58 people and left hundreds missing, and that executives may be punished."

27. That same day, *Reuters* reported that "Brazilian securities industry regulator CVM has opened a probe into miner Vale SA's filings related to a burst tailings dam in the town of Brumadinho[.]"

28. On this news, shares of Vale plunged during intraday trading on January 28, 2019, trading at $11.28 around the time of the filing of this complaint.

29. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL EVIDENCE OF SCIENTER

30. On February 6, 2019, the *Wall Street Journal* reported report that the Company was in possession of a detailed report **written months before the disaster** indicating that the dam was not certifiable:

> Inspectors of a Brazilian mining-waste dam whose collapse last month killed at least 150 people had warned its owner that faulty water drainage and monitoring

9

> systems represented a potential risk of failure, according to a safety report reviewed by The Wall Street Journal.
>
> The report, provided to the mine's owner Vale SA months before the disaster, found that flaws in monitoring crucial water concentrations and drainage made it difficult for the company to fully assess the dam's stability.
>
> TÜV SÜD, the company that inspected the dam and wrote a 128-page report for Vale in September, ultimately certified the dam as stable. But two independent mining dam experts who reviewed the report with the Journal said the dam shouldn't have been certified and Vale should have recognized potential risks.

31. Then on February 7, 2018, the *Wall Street Journal* reported that " [a] safety auditor who inspected a Vale SA mine-tailings dam that collapsed in January killing at least 150 people told police he felt pressured to attest to its stability, despite indications it was unsafe, because he feared losing business with the company, according to court documents seen by The Wall Street Journal."

32. The article went on to state the following, which evidences Defendant' knowledge that their attestations that the Company was in compliance with the law were false:

> The safety auditor, Makoto Namba, a 62-year-old civil engineer employed by German inspection company TÜV SÜD, told police that Vale knew there were problems with the dam, according to the court documents. Mr. Namba said he told Vale that water was leaking into the reservoir behind the dam, and that its drainage system was insufficient.
>
> \*\*\*
>
> Mr. Namba told police that Vale should have relocated the canteen and offices on the site as they were directly beneath the dam and potentially in danger, according to the court documents.
>
> \*\*\*
>
> When TÜV SÜD attested to the dam's safety in a report in September, it also detailed a number of factors that mining experts said should have raised red flags about the overall safety of the dam at Vale, largely related to the dam's drainage and how much water was in the tailings collected by the dam.

> In TÜV SÜD's report, which was reviewed by the Journal, the auditor recommended that Vale repair damage to drainage systems in certain parts of the dam. Some of the water-drainage tubes and channels had been clogged by vegetation or damaged by cows trampling over the site.
>
> ***
>
> Mr. Namba said he signed off on the safety of the dam on the promise that Vale would follow TÜV SÜD's recommendations. According to the court documents, Mr. Namba said that a technical director at Vale told him, "Is TÜV SÜD going to sign this safety declaration or not?"
>
> Mr. Namba told police he felt that comment was a "way to pressure Mr. Namba and TÜV SÜD to sign the safety declaration or risk losing the contract." Mr. Namba told police he started working for TÜV SÜD when it acquired a Brazilian consulting firm where he had worked for two decades.
>
> Emails exchanged between Vale and TÜV SÜD just days before the dam collapsed showed that Vale was also aware of potential problems with the sensors at the dam, according to the documents.
>
> Mr. Namba told police that if those problems with the sensors were confirmed, and his own son were working at the facility, he would have called him immediately and told him to flee, according to the documents.

33. Accordingly, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal common stock laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Vale, their control over, and/or receipt and/or modification of Vale's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Vale.

**LOSS CAUSATION**

34. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Vale's common stock and operated as a fraud or deceit on Class Period purchasers of Vale common stock by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Vale's common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Vale common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal common stock laws.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

35. At all relevant times, the market for Vale's common stock was an efficient market for the following reasons, among others:

(a) Vale's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) Vale filed periodic public reports with the SEC; and

(c) Vale regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

36. As a result of the foregoing, the market for Vale's common stock promptly digested current information regarding Vale from all publicly available sources and reflected such information in the prices of the common stock. Under these circumstances, all purchasers of Vale

common stock during the Class Period suffered similar injury through their purchase of Vale common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

37. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Vale who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

38. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Vale common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

39. The members of the Class are so numerous that joinder of all members is impracticable, since Vale has millions of shares of stock outstanding and because the Company's shares were actively traded on the NYSE. As of February, 2018, Vale had more than 1.24 billion shares issued and outstanding. While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

40. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a) whether the Exchange Act was violated by Defendants;

(b) whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e) whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f) whether the price of Vale common stock was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of Vale's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

41. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

42. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action common stock litigation. Plaintiff has no interests which conflict with those of the Class.

43. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of
### the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

44. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

45. This Count is asserted by Plaintiff on behalf of himself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

46. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Vale's common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Vale's common stock at artificially inflated prices. In furtherance

15

of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

47. Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Vale's common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

48. As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded common stock would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

49. Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

50. As a result of Defendants' fraudulent activity, the market price of Vale was artificially inflated during the Class Period.

51. In ignorance of the true financial condition of Vale, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Vale containing the misleading information, purchased or otherwise acquired Vale's common stock at artificially inflated prices during the Class Period.

52. Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Vale's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Vale's stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Vale's common stock through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Vale.

53. Throughout the Class Period, Defendants were aware of material non-public information concerning Vale's fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

54. As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Vale common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

55. Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

56. During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

57. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal common stock laws. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

58. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Vale's business, the information contained in its filings with the SEC, and its public

statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to common stock analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Vale's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

59. The Individual Defendants acted as controlling persons of Vale within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Vale to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Vale and all of its employees. As alleged above, Vale is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

60. As a direct and proximate result of the wrongful conduct of Vale and the Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(A) Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and her counsel as Class counsel;

(B)   Awarding Plaintiff and the members of the Class damages, including interest;

(C)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D)   Awarding such equitable/injunctive or other relief as the Court may deem just and proper

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: New York, New York
       February 8, 2019

Respectfully submitted,

**HACH ROSE SCHIRRIPA & CHEVERIE LLP**

By: */s/ Frank R. Schirripa*
Frank R. Schirripa, Esq., (FS 1960)
Gregory Mark Nespole, Esq., (GN 6820)
112 Madison Ave, 10th Floor
New York, NY 10016
Telephone: (212) 213-8311
Facsimile: (212) 779-0028
fschirripa@hrsclaw.com
gnespole@hrsclaw.com

**LAW OFFICES OF MARC S. HENZEL**
Marc S. Henzel
230 Old Lancaster Road, Suite B
Merion Station, PA 19066
Telephone: (610) 660-8000
Facsimile: (610) 660-8080
mhenzel@henzellaw.com

*Counsel for Plaintiff and Proposed Class*